Robert A. FALISE, et al., Plaintiffs,

v.

AMERICAN TOBACCO CO., et al., Defendants.

H.K. Porter Co., Plaintiff,

v.

B.A.T. Industries PLC, et al., Defendants.

Raymark Industries Inc., Plaintiff,

v.

American Tobacco Co., et al., Defendants.

National Asbestos Workers' Medical Fund, et al., Plaintiffs,

v.

Philip Morris Inc., et al., Defendants.

Blue Cross and Blue Shield of New Jersey, Inc., et al., Plaintiffs,

v.

Philip Morris Inc., et al., Defendants.

Nos. CV–99–7392 (JBW), CV–97–7658 (JBW), CV–98–675 (JBW), CV–98–1492 (JBW), CV–98–3287 (JBW).

United States District Court, E.D. New York.

Jan. 4, 2000.

---

## MEMORANDUM AND ORDER

WEINSTEIN, Senior District Judge.

Defendants have appealed from the magistrate judge's order of November 17, 1999, compelling disclosure of approximately 37,000 documents claimed to be subject to the attorney-client privilege. The sole issue is whether they are available for the purpose of discovery. There is no need to decide now whether these materials will be admissible at trial.

These documents have already been ordered released to the public in connection with Minnesota state courts proceedings, although this order has apparently been stayed. *See Minnesota v. Philip Morris, Inc.,* No. C1–94–8565, 1998 WL 257214 (Minn.Dist.Ct.1998). Congress also released onto the internet what appear to be the same documents, again over defendants' objection. They were widely commented upon by the media. *Cf. Simon v. Philip Morris, Inc.,* 99

CV 1988, (E.D.N.Y. Jan. 4, 2000) (documents in question relied upon in decision on jurisdiction with consent of defendant B.A.T. Industries, p.l.c.).

The magistrate judge's order is affirmed for the reasons stated in his amended opinion insofar as it is limited to the issue of discovery. *See Falise v. American Tobacco Co.,* 99 CV 7392 (E.D.N.Y. Dec. 28, 1999) (Gold, M.J.). Moreover, once Congress released the documents to the world at large, there was no point in trying to hide their contents at the discovery stage.

First, a trial court should not blind itself in the investigative stage of an important litigation to critical facts known to the world. Justice is blind to persons; absent strong policy reasons, it should not act as if it were ignorant of what every well advised person knows. *Cf., e.g., von Bulow v. von Bulow (In re von Bulow),* 828 F.2d 94, 103 (2d Cir.1987) ("Matters actually disclosed in public lose their privileged status because they obviously are no longer confidential. The cat is let out of the bag, so to speak.").

Second, as a constitutional matter, Congress has the broadest power and responsibility of inquiry and of informing the public about what it has learned. *See, e.g., Watkins v. United States,* 354 U.S. 178, 187, 200–01 & n. 33, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957) (discussing breadth of congressional power to investigate and inform). Any backhanded attempt by the courts to muzzle Congress even partially by covering up in the investigative stage of a litigation what that organ of government has revealed could be construed as a form of unjustified interference with, and criticism of, another branch of government.

There may conceivably be situations where protection of the constitutional and other rights of individuals requires the courts to check congressional abuse of its investigative powers. *See id.* at 196–200, 77 S.Ct. 1173 ("[T]here is no congressional power to expose for the sake of exposure."); *see also United States v. Welden,* 377 U.S. 95, 116–18, 84 S.Ct. 1082, 12 L.Ed.2d 152 (1964) (Douglas, J., dissenting) ("We have repeatedly said that a congressional investigation which exposes

for exposure's sake or which is 'conducted solely for the personal aggrandizement of the investigators or to "punish" those investigated (is) indefensible.'" (quoting *Watkins*, 354 U.S. at 187, 77 S.Ct. 1173)). This is not such a case. The constitutional rights of defendants are not claimed to have been violated.

A different rule may apply at trial where some balancing between partial protection of a tattered privilege claim and the need for the documents may be required. True, the Supreme Court has generally rejected a balancing test in determining the contours of the attorney-client privilege. *See Swidler & Berlin v. United States*, 524 U.S. 399, 118 S.Ct. 2081, 2086, 141 L.Ed.2d 379 (1998); *Upjohn v. United States*, 449 U.S. 383, 393, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). Yet *Swidler & Berlin* and *Upjohn* involved attempts by the government to obtain information that still remained confidential. In the instant case, the information has already been released to the public; the question will be to what extent it should be admissible at trial.

■ If privileged material was revealed without fault of the owner and without waiver, courts have the power to take reasonable steps to give the holder some protection— and thus to uphold the concept and power of the privilege for the future. Thus, there may be circumstances where the iron-clad rule enunciated in *Swidler & Berlin* and *Upjohn* as interpreted by *von Bulow* may be inappropriate. The court may find it necessary to consider the privilege claim in connection with other factors such as probative force, necessity, and cumulativeness. *Cf. In re Petroleum Prods. Antitrust Litig.*, 680 F.2d 5, 7 (2d Cir.1982) (reporters' privilege may be trumped by "highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources"). Such an approach may uphold the concept of privileged communications without making the litigation process appear foolish for failing to recognize what everyone else already knows.

This complex question is best left for resolution prior to trial as the admissibility of individual documents is considered at an in limine pre-trial hearing. The matter is on appeal in Minnesota, so that the nature of that state's view of the privilege as applied to the documents in question may be available at the time of trial in the instant case, now scheduled for April 2000.

The motion of defendants to suppress is denied. The opinion of the magistrate judge is appended to the present memorandum and made a part of it.

SO ORDERED.

## *AMENDED MEMORANDUM & ORDER*

GOLD, United States Magistrate Judge.

### *Introduction*

Plaintiffs in these related actions assert claims for damages against the major tobacco companies. Plaintiffs' complaints set forth various causes of action, including claims under the federal Racketeer Influenced and Corrupt Organizations (RICO) statute.

Currently pending before the Court are plaintiffs' motions to declare approximately 37,000 documents not privileged and to compel disclosure of related communications pursuant to a claim of subject matter waiver.[1] Plaintiffs assert that defendants waived any privilege that may have attached to these documents by consenting to their release when settling *The State of Minnesota v.*

---

1. By letter dated November 12, 1999, counsel for British American Tobacco (Investments) Limited (BAT), formerly known as British–American Tobacco Company Limited (BATCo), noted that neither plaintiffs in *Blue Cross and Blue Shield of New Jersey, et al. v. Philip Morris Incorporated, et al.*, Case No. CV–98–3287 (E.D.N.Y.) (JBW), nor plaintiffs in *National Asbestos Workers Medical Fund, et al. v. Philip Morris, Inc. et al.*, No. CV–98–1492 (E.D.N.Y.) (JBW), have sought relief regarding BATCo's privileged documents. Counsel for BAT requested that as BAT and BATCo were not parties to the Minnesota litigation, and as the history of the BATCo documents, which were not among those released on the internet by Congress, is different from that of the other documents, the Court make no ruling as to BATCo's privilege assertions. As it appears that none of the plaintiff is seeking relief with regard to the BATCo documents, this decision does not address any privilege claims with respect to those documents. Thus, while some 39,000 documents were declared not privileged in the Minnesota litigation, this Court addresses only the approximately 37,000 non-BAT or BATCo documents that were released by Congress on the internet.

*Philip Morris, Inc., et al.,* Case No. C1–94–8565, 1998 WL 257214 (Minn.Dist.Ct.1998), the "Minnesota litigation," and by not sufficiently resisting congressional subpoenas calling for their production. Plaintiffs further argue that defendants' privilege claims should be rejected because most, if not all, of the documents are now publicly available. Finally, plaintiffs contend that defendants' waiver extends not only to the documents at issue themselves, but also to all otherwise privileged communications on the same subjects as those documents.

Although the issues raised by plaintiffs apply to each of the captioned actions, formal motions have been made only in *Falise, et al. v. American Tobacco Co., et al.,* No. CV–97–7640 (E.D.N.Y.) (JBW) and *National Asbestos Workers Medical Fund, et al. v. Philip Morris, Inc., et al.,* No. CV–98–1492 (E.D.N.Y.) (JBW). The complaint in *Falise* was dismissed for lack of subject matter jurisdiction by memorandum and order dated November 2, 1999. However, all parties in the remaining cases have had the opportunity to make submissions on the issue, and this memorandum and order will be entered in each of the four above-captioned actions. *See* Tr. of Proceedings Held on Oct. 28, 1999, at 20–22.

As a practical matter, it should be noted that defendants have already provided the documents in question to plaintiffs, and that they have been available for plaintiffs' use in discovery. Defendants therefore assert that plaintiffs' motion to declare the documents not privileged is premature, and should be addressed only when plaintiffs identify those documents that will be offered at trial. Because the number of documents in question is enormous, and because of the magnitude of these cases, I conclude that a ruling at this juncture on defendants' privilege claims will assist the Court and the parties in their efforts to manage these complex litigations effectively.

Plaintiffs assert two bases for finding waiver of the asserted privileges: 1) consent by defendants to release of the documents when settling the Minnesota litigation and 2) release of the documents through compliance with congressional subpoenas. For the reasons discussed below, I find a waiver based on defendants' actions in settling the Minnesota litigation. Due to the unique circumstances of these cases, I further find that the documents should be deemed not privileged as a matter of public policy. Having decided for these independent reasons that the documents should not be treated as privileged, I do not reach the issue of whether defendants' compliance with Congressman Bliley's subpoenas also constituted a waiver of the asserted privileges.[2] Because defendants have not unfairly decided to disclose some privileged communications while seeking to maintain the confidentiality of others, I conclude that plaintiffs' claim of subject matter waiver should be rejected. Finally, I provide some guidance with respect to how the 37,000 documents may be used during the examination of witnesses at depositions.

### Background

The facts giving rise to plaintiffs' motions are set forth in detail in several court decisions. *See, e.g., Iron Workers Local Union No. 17 Ins. Fund, et al. v. Philip Morris, Inc., et al.,* 35 F.Supp.2d 582 (N.D.Oh.1999). Accordingly, these facts are recounted only briefly here.

Defendants raised privilege claims with respect to more than 230,000 documents in the Minnesota litigation. Hoskins 12/16/98 Aff., Ex. 11 (Judge Fitzpatrick's 3/7/98 Memorandum and Order at 11). After taking evidence and hearing arguments regarding privilege and the crime-fraud exception, the Minnesota court found that the plaintiffs had established a prima facie case for invoking the crime-fraud exception. *Id.,* Ex. 1. The Minnesota trial court then appointed a special master to review defendants' claims of privilege and set forth procedures for review and examination of randomly selected documents falling within each of twelve specified

**2.** For a well-reasoned and thorough discussion of whether defendants' compliance with the congressional subpoenas waived their asserted privileges, *see Commonwealth of Massachusetts v.*

*Philip Morris, Inc., et al.,* Case No. 95–CV–7278 (Mass.Super.Ct.1998). Pl.'s App. to Letter from Bicks to M.J. Gold of 10/12/99, Ex. C.

categories. *Id.*, Ex. 2. Explaining its decision to permit a review of randomly selected documents, the Minnesota trial court emphasized, in a memorandum, that it would not be feasible for the Special Master to perform an *in camera* review of each individual document:

> Arbitrarily assuming that it would take only five minutes to retrieve a document, check it against the privilege log, read it quickly, and assign it to a 'privilege category' ... it would take the Special Master 750,000 minutes, or 12,500 hours to review all of the privileged documents. This is roughly 6.25 years of a lawyer's working career. To complete the task in two months, in order that documents found to be non-privileged would be available during the deposition period, it would take more than 30 people working 200 hours per month.

*Id.*, Ex. 1 at 26. The documents were submitted by defendants to the Minneapolis Document Depository, subject to a protective order. *Id.*, Ex. 3.

The Special Master held hearings and considered written submissions on the issue of privilege. *Id.*, Exs. 6, 9. He also reviewed random samples of the documents falling within each of twelve previously identified categories. *Id.* Ultimately, he concluded that a large number of documents were either subject to the crime-fraud exception or not privileged in the first instance. *Id.*, Exs. 6 at 42–52, 9 at 100 *et seq.* These documents comprise the bulk of the 37,000 documents which are the subject of the pending motions.

In his first report, issued in September 1997, the Special Master determined that approximately 800 "Liggett" documents which had been deposited with the court pursuant to Liggett's settlement in the Minnesota litigation were not privileged. *Id.*, Ex. 6. This report was adopted by the Minnesota trial court, over the objections of the non-Liggett defendants, who had not settled, on December 16, 1997. *Id.*, Ex. 7. Congressman Bliley, Chair of the House Commerce Committee, obtained these documents on December 5, 1997, after issuing subpoenas for their production to the non-Liggett defendants. These approximately 800 documents were posted on the internet by Congress on December 18, 1997. *Id.*, Ex. 8.

In a subsequent report, dated February 10, 1998, the Special Master addressed privilege claims raised with respect to the remaining non-Liggett documents. *Id.*, Ex. 9. On February 19, 1998, Congressman Bliley issued subpoenas to defendants, excluding the BATCo defendants, for the documents addressed in the Special Master's February 1998 report, as well as other documents ordered produced by the Minnesota trial court. *Id.*, Ex. 10; Quigley 1/18/99 Aff., Ex. F. By order dated March 7, 1998, the Minnesota trial court adopted the Special Master's February 1998 report, and ordered that the documents found not privileged by the Special Master be produced within 48 hours. Hoskins 12/16/98 Aff., Ex.11. The Minnesota Court of Appeals issued a stay of the March 7 order pending appeal. Defendants then wrote to Congressman Bliley requesting an extension of the deadline for responding to the subpoenas until after the appeal had been decided. *Id.*, Ex. 12. Ultimately, the Minnesota appellate courts declined to set aside the March 7, 1998 order of the trial court.

On March 28, 1998, the Minnesota trial court ordered that the public be given access to the documents at the Minnesota document depository. *Id.*, Ex. 22. That order provided, in part, as follows:

> documents released by this Court in its Order dated March 7, 1998, review of which was denied by Order of the Court of Appeals denying alternative petitions for a writ of prohibition or a writ of mandamus and further review of which was denied by Order of the Minnesota Supreme Court on March 27, 1998, shall be made available for public access at such time when Plaintiffs have completed their review.

*Id.*, Ex. 22 at 2–3. However, in its May 31, 1998 order, discussed below, the Minnesota court noted that this order did not, in fact, result in the documents being made available. *Id.*, Ex. 17.

On April 6, 1998, the United States Supreme Court denied defendants' application

for a stay pending a petition for writ of certiorari. *See id.*, Ex. 14 (Letter from Goold to Bliley of 4/6/98). On April 6, 1998, the day the Supreme Court refused to issue a stay, Congressman Bliley wrote to defendants, informing them that "[t]he claim of privilege for the documents requested in the subpoenas will not be recognized. Further, unless the documents in question are produced immediately, I intend to proceed with a contempt resolution for enforcement of the subpoenas by the House of Representatives." *Id.*, Ex. 13.

That same day, defendants produced the subpoenaed documents to Congress on CD Rom and paper with accompanying privilege logs, glossaries of names and indices. In their accompanying letters, defendants continued to assert that the documents were privileged and requested that the Committee be sensitive to the effects of their public dissemination. Quigley 1/18/99 Aff., Ex. I. Also on April 6, 1998, defendants Philip Morris, R.J. Reynolds, Brown & Williamson and Lorillard issued a press release in response to the Supreme Court ruling. Hoskins 12/16/98 Aff., Ex19.

Congressman Bliley met with defendants' representatives on April 16, 1998, and defendants sent letters to him, once again urging him not to disclose the materials to the public. Quigley 1/18/99 Aff., Ex. J. Nevertheless, Congress released the documents on the internet on April 22, 1998, and defendant R.J. Reynolds responded with a press release. Hoskins 12/16/98 Aff., Exs. 8,18.

On May 8, 1998, defendants entered into a Settlement Agreement and Stipulation for Entry of Consent Judgment with plaintiffs in the Minnesota litigation. *Id.*, Ex. 15. Section III A of the Settlement Agreement provided that the agreement "resolve[d] all claims between the State and the Defendants, except for issues pending before the court pertaining to the discoverability or production of documents for which the Defendants reserve their rights of appeal." *Id.*

The Minnesota trial court entered a Consent Judgment on May 18, 1998 (signed on May 8). Quigley 1/18/99 Aff., Ex. K. Section VII C of the Consent Judgment provides a mechanism for plaintiffs to seek approval from the court to make the documents available to the public. *Id.*[3] The Consent Judgment adopts the definitions set forth in the Settlement Agreement, including the definition of "Court" as "the District Court of the State of Minnesota, County of Ramsey, Second Judicial District." *See id.*; Hoskins 12/16/98 Aff., Ex. 15, ¶ I.C.6. Thus, the parties agreed to place the decision of whether to make the documents in question available to the public in the hands of the Minnesota trial court.

As provided for in the Consent Judgment, plaintiffs sought court approval to make the documents which are the subject of the pending motions available to the public. Defendants objected and, on May 31, 1998, the Minnesota court issued an order releasing the documents and making them public. Hoskins 12/16/98 Aff., Ex. 17. In this order, the Minnesota court noted that the documents should have been made available to the public pursuant to its order of March 28, 1998:

> The release of documents that have been deprivileged and/or released pursuant to previous Court Orders should have been placed in the depository and deemed available to the public pursuant to the Court's Order Providing Public Access to the Minnesota Document Depository dated March 28, 1998 subject only to the parties' first right of review.

*Id.*

On June 9, 1998, the Judge who had been presiding over the Minnesota litigation, the Honorable Kenneth J. Fitzpatrick, retired, and the Minnesota case was transferred to the Honorable Lawrence D. Cohen. *Id.*, Ex. 23. On June 15, 1998, Judge Cohen entered an order, stipulated to by the parties, staying Judge Fitzpatrick's May 31, 1998 order pending further ruling by the court. *Id.*, Ex. 24. However, Judge Cohen's order provided that:

---

**3.** It appears that there are two available versions of the Consent Judgment, one which has a blank section I, making the section in question VIII C, and one which omits the blank section I, making the section in question VII C.

Notwithstanding the above, this Order does not address or affect the disclosure of

a) those documents identified in the May 31 Order that were admitted as trial exhibits by Court Order in this action; or of

b) those documents identified in the May 31 Order that have been posted on the internet.

*Id.*

Plaintiffs moved the court again to release the documents to the public, defendants filed opposition to this motion, and the Minnesota court granted plaintiffs' motion on November 24, 1998.[4] Letter from Mansfield to M.J. Gold of 10/5/99, Ex. D; Letter from Bernstein–Gaeta to M.J. Gold of 11/4/99, Ex. 11 at 5. The provisions for release of the documents in the March 28, 1998 order were adopted by reference in the November 24, 1998 order, with the exception of two specified RJR documents. *See* Letter from Bernstein–Gaeta to M.J. Gold of 11/4/99, Ex. 11 at ¶ 1.B. This order was stayed for 30 days and provided that, if any of the defendants pursued appellate remedies within the 30 days, the court would, upon further motion, address the appropriateness of a further stay. *Id.*, Ex. 11 at ¶ 5.

Defendants sought review of the November 24 order in the Minnesota Court of Appeals, but the Court of Appeals denied relief on procedural grounds. *See id.*, Ex. 7 at ¶ 6. On March 30, 1999, the Minnesota trial court entered an order, incorporating its ruling of November 24, 1998, by reference, and providing that "all outstanding issues that have been raised to date before the Court concerning post-judgment disputes regarding public access to the documents and indices produced by Defendants during discovery are resolved through this Order," *Id.*, Ex. 10. There is no indication in any of the voluminous materials submitted by the parties that this order of March 30, 1999 has been stayed.[5] Thus, although this ruling is the subject of a pending appeal, it stands at this time as the final order of the Minnesota trial court.

## Discussion

### Attorney–Client and Work–Product Privileges

Where plaintiffs are asserting federal claims, assertions of attorney-client privilege are resolved pursuant to federal law. *See In re Kidder Peabody Securities Litigation,* 168 F.R.D. 459, 468 n. 8 (S.D.N.Y. May 16, 1996); Fed.R.Evid. 501. Moreover, where pendent state law claims are raised, federal law generally governs all claims of privilege raised in the litigation. *See Iron Workers,* 35 F.Supp.2d at 589–90 n. 14 (citing *Hancock v. Dodson,* 958 F.2d 1367, 1372 (6th Cir.1992)). Under federal and New York State law, a party waives attorney-client privilege where "he voluntarily undertakes actions that will predictably lead to the disclosure of the document." *Bowne of N.Y. City, Inc. v. AmBase Corp.,* 150 F.R.D. 465, 479 (S.D.N.Y.1993); *see also In Re von Bulow,* 828 F.2d 94, 101 (2d Cir.1987) ("it is the client's responsibility to insure continued confidentiality of his communications").

Issues relating to work-product protection in the federal courts are always governed by Federal Rule of Civil Procedure 26(b)(3) and

---

4. While Judge Cohen's order is dated November 24, it was filed on November 25.

5. There is some confusion regarding the scope and duration of the stay provided for in the November 24, 1998 order. Defendants urge that the November 24 stay remains in effect pursuant to an agreement between the parties. *See* Letter from Booth Cassidy & Wharton to M.J. Gold of 12/2/99, Ex. A at 5; Quigley 1/18/99 Aff., Ex. P. Even if defendants are correct in their assertion, this has no effect on this Court's ruling for two reasons. First, this Court does not depend solely on events in the Minnesota litigation, but relies alternatively on public policy grounds in declaring the approximately 37,000 documents not privileged. Second, regardless of the scope and duration of the November 24, 1998 stay, the approximately 37,000 documents that had been posted on the internet had already been released by order of May 31, 1998, and were specifically excepted from the June 15, 1998 stay, which provided:

> Notwithstanding the above, this Order does not address or affect the disclosure of
> a) those documents identified in the May 31 Order that were admitted as trial exhibits by Court Order in this action; or of
> b) those documents identified in the May 31 Order that have been posted on the internet.

Hoskins 12/16/98 Aff., Ex. 24.

federal case law, regardless of the basis for jurisdiction. *See, e.g., Bowne,* 150 F.R.D. at 471; *EDO Corp. v. Newark Ins. Co.,* 145 F.R.D. 18, 21 (D.Conn. Dec. 9, 1992). Rule 26(b)(3) provides for discovery of documents "prepared in anticipation of litigation or for trial by or for another party" only upon a showing of substantial need. Unlike the attorney-client privilege, the work-product privilege is not necessarily waived by disclosure to any third party; rather, "the courts generally find a waiver of the work product privilege only if the disclosure 'substantially increases the opportunity for potential adversaries to obtain the information.'" *In re Pfizer Inc. Sec. Litig.,* No. 90 Civ. 1260, 1993 WL 561125, *6 (S.D.N.Y. Dec. 23, 1993) (citing *In re Grand Jury Subpoenas,* 561 F.Supp. 1247, 1257 (E.D.N.Y.1982)).

### The Minnesota Consent Judgment and Waiver With Respect to the 37,000 Documents

Assuming that some privilege may have attached to the documents ordered disclosed by the Minnesota trial court, the questions raised by plaintiffs' motion are whether defendants waived that privilege by intentionally taking actions that would predictably lead to disclosure, and whether that disclosure "'substantially increase[d] the opportunity for potential adversaries to obtain the information.'" *Id.* With respect to the Minnesota Consent Judgment, I find the answers to both questions to be yes.

While consent decrees are judicial orders, they are also "agreements between parties to litigation that 'should be construed basically as contracts.'" *United States v. Int'l Bhd. of Teamsters,* 998 F.2d 1101, 1106 (2d.Cir.1993) (quoting *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 236–37, 95 S.Ct. 926, 934, 43 L.Ed.2d 148 (1975)); *see also EEOC v. New York Times Co.,* 196 F.3d 72, 77–78 (2d Cir.1999). Because the precise terms of consent decrees are the result of careful negotiation, "the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *Teamsters,* 998 F.2d at 1106 (citing *U.S. v. Armour & Co.,* 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971)).

Thus, this Court construes the Consent Judgment according to its terms.

Section VII C of the Consent Judgment provides:

[f]or documents upon which a privilege was claimed and found not to exist, including any briefs, memoranda and other pleadings filed by the parties which include reference to such documents, Plaintiffs may seek court approval to make such documents available to the public, provided that any such request be made to the Court within 45 days of the date of entry of this Consent Judgment.

Quigley 1/18/99 Aff., Ex. K. The Consent Judgment incorporates the Settlement Agreement's definition of "Court" as the Minnesota trial court. *See id.;* Hoskins 12/16/98 Aff., Ex. 15, ¶ I.C.6.

The language contained in section VII C of the Minnesota Consent Decree is unambiguous on its face. Section VII C provides a mechanism for plaintiffs to seek approval from the Minnesota trial court to release the documents in question to the public, and therefore reflects an agreement between the parties that the trial court would be empowered to decide whether the documents are to be released.

Moreover, it appears that the Consent Decree provides that public disclosure will be virtually automatic upon plaintiffs' application. The express language of the Consent Decree provides a mechanism by which plaintiffs may seek release of the documents, but makes no provision for objections by defendants. While defendants suggest that their right to object was so obvious that no explicit provision was required, I am not persuaded by that argument. It could similarly be argued that plaintiffs' right to move for the release of the documents was obvious, but, it is important to note, that right was specifically provided for in the Consent Decree.

This asymmetry takes on additional significance from the fact that defendants could have bargained for a different result which would have afforded their privilege claims greater protection. Defendants might, as a condition of settlement, have sought to avoid

public release of the documents in a number of ways. For example, defendants could have sought a stipulation that the March 7, 1998 order adopting the Special Master's report and the May 31, 1998 order compelling release of the documents be vacated.[6] They might have sought a stipulation, as a condition of settlement, that the previously entered protective order remain in place and that any of the documents in question that had previously been produced during discovery be returned or destroyed. They might have sought specific language providing for objections to plaintiffs' application to release the documents or expressly permitting a right to appeal from the Minnesota trial court's determination of that issue. The silence of the Consent Judgment with respect to these possibilities persuades me that defendants bargained them away and consented to a mechanism for the release of the documents in return for the benefits they obtained under the settlement agreement.

Defendants argue that their submission of opposition to plaintiffs' application to release the documents demonstrates that their right to do so was implicit in the Consent Judgment. This argument, too, must be rejected. First, as noted above, consent decrees are to be strictly construed according to their terms. The plain language of the Consent Judgment makes no provision for opposition by defendants.

Moreover, even if the Consent Judgment could be construed to permit defendants to oppose disclosure, it plainly provides that the Minnesota trial court will decide whether the documents in issue should be made publicly available or not. Defendants did oppose the release of the documents, but they did not prevail; the Minnesota court has ordered that the documents be released. Moreover, although the original order releasing the documents was stayed for a period of time, defendants stipulated to the terms of a June 15, 1998 order staying the May 31, 1998 order releasing the documents, but providing that:

> Notwithstanding the above, this Order does not address or affect the disclosure of a) those documents identified in the May 31 Order that were admitted as trial exhibits by Court Order in this action; or of b) those documents identified in the May 31 Order that have been posted on the internet.

Hoskins 12/16/98 Aff., Ex. 24. Even more significantly, plaintiffs' subsequent application for release of the documents was granted and a final order was entered by the Minnesota court on March 30, 1999.[7] The Consent Decree unambiguously vests the power to decide whether the documents are to be released in the Minnesota trial court. Thus, defendants consented to place this issue in the hands of the Minnesota trial court and to be bound by that court's determination.[8] This constitutes action by defendants "that will predictably lead to the disclosure of the document," *In re Kidder Peabody*, 168 F.R.D. at 468, and that " 'substantially increases the opportunity for potential adversaries to obtain the information,' " *In re Pfizer Inc.*, 1993 WL 561125 at *6, satisfying the requirements for waiver of both attorney-client privilege and work-product protection.[9]

---

6. *Cf. Sackman v. The Liggett Group, Inc.*, 189 F.R.D. 58 (E.D.N.Y.1999) (granting intervenor's' request for vacatur of adverse orders relating to compelled production of documents claimed to be protected by attorney-client and work-product privileges following a settlement between the original parties).

7. While a ruling on an appeal of this order may affect this analysis, it is appropriate, as discussed in the introduction, to rule on the issue of privilege at this time. Additionally, because I also find a public policy basis for declaring the documents not privileged, a ruling for defendants on appeal would not necessarily require a different conclusion.

8. It is not surprising that defendants would have bargained away available opportunities to afford the documents in issue greater protection. By the time the settlement agreement and consent decree were executed in May of 1998, Congress had already obtained the 37,000 documents and posted them on the internet.

9. This conclusion is consistent with the decisions of a number of other courts that have also examined the question of whether the Minnesota Consent Decree constituted a waiver of privilege by defendants. *See, e.g., Tompkins v. R.J. Reynolds Tobacco Co.*, Case No. 97–CV–823 (N.D.N.Y. Oct. 21, 1998), Pl.'s App. to letter from Bicks to M.J. Gold of 10/12/99, Ex. B; *Wisconsin v. Philip*

### Public Policy Considerations Supporting Disclosure of the 37,000 Documents

Regardless of whether the Minnesota Consent Judgment represents a waiver of the asserted privileges by defendants, the unique circumstances of these cases implicate significant public policy considerations which weigh in favor of declaring the documents in question not privileged. For the reasons stated below, I conclude that the documents in issue should be deemed not privileged even if defendants' conduct during the Minnesota litigation did not amount to a waiver.

Rule 501 of the Federal Rules of Evidence provides that, where the court is determining questions of federal substantive law, "the privilege of a witness [or] person ... shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience." Courts have long recognized the "fundamental maxim that the public ... has a right to every man's evidence." *Jaffee v. Redmond*, 518 U.S. 1, 9, 116 S.Ct. 1923, 1928, 135 L.Ed.2d 337 (1996). In light of this principle, it is understood that "an existing privilege should be interpreted no more broadly than necessary" but " 'must be strictly construed.' " *Application of American Tobacco Co.*, 880 F.2d 1520, 1527 (2d Cir. 1989) (citing *Trammel v. United States*, 445 U.S. 40, 50, 100 S.Ct. 906, 912, 63 L.Ed.2d 186 (1980)).

With respect to the attorney-client privilege, the Second Circuit has stated that "[t]he privilege cannot stand in the face of countervailing law or strong public policy and should be strictly confined within the narrowest possible limits underlying its purpose." *U.S. v. Goldberger & Dubin, P.C.*, 935 F.2d 501, 504 (2d Cir.1991) (collecting cases).

Similarly, the Supreme Court has reasoned that "since the [attorney-client] privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose." *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976).

In this case, any policy bases for maintaining the confidentiality of the documents in question have been eviscerated by their widespread disclosure. The fundamental purpose of the attorney-client privilege is "to encourage full and frank communication between attorneys and their clients." *Upjohn Co. v. U.S.*, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). The documents in issue, however, are already publicly available via the internet, and have been the subject of press releases and news stories.[10] As the Second Circuit has noted, "[m]atters actually disclosed in the public lose their privileged status because they obviously are no longer confidential. The cat is let out of the bag, so to speak." *In re von Bulow*, 828 F.2d at 103. Thus, to the extent that disclosure might inhibit candid attorney-client communications, that inhibition has already occurred.

The policy behind the work-product protection is to shield an attorney's mental processes in analyzing and preparing a client's case. *See United States v. Nobles*, 422 U.S. 225, 238, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975). This is a practical protection, "grounded in the realities of litigation in our adversarial system." *Id.* In this case, the documents in question, which have been made available to the public on the internet, may readily be accessed by plaintiffs. To the extent that work-product protection might shield the litigation strategy of defendants' attorneys from plaintiffs in these cases, that shield has been rendered ineffectual because

*Morris, Inc.*, No. 97–CV–328, slip op. (Wis.Cir.Ct. Oct. 21, 1998), Pl.'s App. to letter from Bicks to M.J. Gold of 10/12/99, Ex. D; *Maryland v. Philip Morris*, No. 96122017/CL211487, slip op. (Md. Cir.Ct. Aug. 5, 1998), Pl.'s App. to letter from Bicks to M.J. Gold of 10/12/99, Ex. E; *Gilboy v. The American Tobacco Co.*, No 314, 002, slip op. (La.Dist.Ct. Dec. 2, 1998), Pl.'s App. to letter from Bicks to M.J. Gold of 10/12/99, Ex. I.

For a particularly well-reasoned and thorough discussion of the implications of the Minnesota

Consent Decree with respect to defendants' claims of privilege, *see Iron Workers Local Union No. 17 Insurance Fund, et al. v. Philip Morris. Inc., et al.*, 35 F.Supp.2d 582, 591–94 (N.D.Oh. 1999).

**10.** *See, e.g.,* John F. Harris, *Clinton Wants the Word Out on Tobacco; Publicizing Industry Documents Would Lift "Veil of Secrecy"*, Wash. Post, July 18, 1998, at A9; Diana Henriques, *Tobacco Lawyers' Role is Questioned*, N.Y. Times, Apr. 23, 1998, at A18.

plaintiffs already have knowledge of the contents of these documents.

Other courts examining the question of privilege with respect to the same documents have also found strong public policy reasons for declaring them not privileged. *See, e.g., Kelley ex rel. Michigan v. Philip Morris, Inc., et al.*, No. 96–84281–CZ, slip op. at 2 (Mich.Cir.Ct. July 9, 1998) (Pl.'s App. to letter from Bicks to M.J. Gold of 10/12/99, Ex. M) ("There simply is no public policy justification to keep what is no longer secret from the eyes of the court when everyone else may see it. Therefore, without regard to whether or not the privilege is waived, this Court finds that the privilege is gone."); *Richardson v. Philip Morris, Inc.*, No. 96145050/CE212596, slip op. at 3–4 (Md.Cir.Ct. November 25, 1997) (Pl.'s App. to letter from Bicks to M.J. Gold of 10/12/99, Ex. K) ("Any effort to apply the privilege now would be tantamount to instructing the *New York Times* to 'unpublish' the Pentagon Papers. That's like closing the barn door after the horse is gone, or stuffing the Genie back into the bottle."). Thus, the widespread public availability of the documents suggests that, due to the unique circumstances presented here, there will be little if any damage to the policies underlying the attorney-client and work-product privileges if plaintiffs' motion is granted.

Moreover, there is no procedural unfairness to defendants in declaring these documents non-privileged on policy grounds. Even if their conduct in the Minnesota litigation did not amount to a waiver of privilege, defendants can make no genuine complaint that they were denied an opportunity to be heard. The Special Master in the Minnesota litigation, after a thorough and exhaustive review of a large number of the documents in question, determined that the documents were either non-privileged or subject to the crime-fraud exception. Defendants were given an opportunity to make arguments supporting their privilege claims first to the Minnesota court, and then to the Special Master, and to make objections to the Special Master's report before it was adopted by the Minnesota court. The Special Master's determination and the subsequent court order adopting his report may not have collateral estoppel effect in the lawsuits pending before this court, but they indicate that defendants have had ample opportunity to litigate the issue of privilege before the Minnesota court. Given the large volume of documents in question, it is difficult to imagine a court undertaking a more thorough review.

In stark contrast to the limited justification for upholding defendants' privilege claims, the enormous public significance of these cases indicates that there is a strong public policy basis for disclosing these documents to the factfinder. The cases at hand are matters of widespread public concern. In his decisions in these cases, Judge Weinstein has emphasized their broad social ramifications:

> This country is currently said to be facing a crisis of health care finance.... If the allegations are true, the well orchestrated racketeering on the part of the defendants has played a major role in precipitating this crisis and inflating this nation's health care costs to their current levels.

> It is difficult to imagine a sector of the economy, a portion of the nation's resources, or an aspect of its economic life, which has not been severely affected by the defendants' alleged racketeering.

*Blue Cross & Blue Shield of N.J. v. Philip Morris*, 36 F.Supp.2d 560, 573 (E.D.N.Y. 1999). The documents in question play a central role in this litigation. They have already been characterized by public officials as providing a detailed picture of the tobacco industry's actions. *See, e.g.*, John Schwartz, *New Tobacco Files Suggest Efforts to Conceal Data*, Wash. Post, April 23, 1998, at A2 (quoting Minnesota Attorney General Hubert H. Humphrey III: " 'These internal documents provide devastating proof that the tobacco lawyers and scientists conspired to ... conceal the truth from the American public.' "). The very fact that the United States Congress undertook to post the documents in question on the internet, making them available to the public, is an additional indication of their public significance.

The significant public interests at stake, and the degree of media attention tobacco

litigation in general has already received, make it clear that these cases will garner a great deal of public attention. In light of the public attention that will doubtlessly be given to these cases, as well as the availability of these documents to the general public, a trial at which these plainly critical documents are unavailable to the finder of fact could seriously undermine the public's confidence in the integrity of the court's processes. Indeed, it would understandably be difficult for the public to accept a verdict where the finders of fact did not have access to documents that have been characterized by public officials as " 'clearly a smoking howitzer.' " Henry Berkowitz & Ellen Yan, *New Documents on Tobacco,* N.Y. Newsday, Apr. 23, 1998, at A4 (quoting Rep. Henry Waxman).

In sum, while the policy bases for preserving confidentiality have been rendered virtually nonexistent as a result of public disclosure of the documents, the policy considerations supporting disclosure are substantial. Accordingly, this aspect of plaintiffs' motion is granted.

### Subject–Matter Waiver

Plaintiffs further contend that defendants, by their conduct in the Minnesota litigation and in responding to the Bliley subpoenas, have also waived their privilege as to all documents and testimony addressing the same subject matter as the 37,000 documents. For the reasons discussed below, I conclude that plaintiffs' argument that there has been broad subject matter waiver should be rejected.

Subject matter waiver is a form of implied waiver "which allows the attacking party to reach all privileged conversations regarding a particular subject once one privileged conversation on that topic has been disclosed," and is rooted in "fairness considerations at work in the context of litigation." *In re von Bulow,* 828 F.2d at 103. In applying subject matter waiver, courts have invoked the metaphors of "sword" and "shield" to describe the type of strategic assertion of privilege that would implicate fairness considerations. *See, e.g., id.; Bristol–Myers Squibb Co. v. Rhone–Poulenc Rorer, Inc.,* No. 95–CV–8833, 1997 WL 801454 at *1 (S.D.N.Y. Dec. 31, 1997); *In re Kidder Peabody,* 168 F.R.D. at 473;

*Stratagem Development Corp. v. Heron Intern. N.V.,* 153 F.R.D. 535, 545 (S.D.N.Y. Feb.28, 1994).

A party uses the assertion of privilege as both a "sword" and "shield" by disclosing certain useful documents "while withholding potentially adverse documents addressing the same subject matter." *Bristol–Myers,* 1997 WL 801454 at *3. Fairness considerations may also come into play where the party asserting the privilege makes factual assertions, the truthfulness of which may be assessed only by an examination of the privileged communications or documents. *See In re Leslie Fay Co. Sec. Litig.,* 161 F.R.D. 274, 283 (S.D.N.Y. May 26, 1995) (" 'selective assertion of privilege should not be merely another brush on an attorney's palette, utilized and manipulated to gain tactical or strategic advantage'." (quoting *In re Steinhardt Partners, L.P.,* 9 F.3d 230, 235 (2d Cir. 1993))); *In re Kidder Peabody,* 168 F.R.D. at 470. Applying these fairness considerations, the Second Circuit has declined to extend subject matter waiver to situations in which the initial disclosure of privileged information was made "extrajudicially and without prejudice to the opposing party." *In re von Bulow,* 828 F.2d at 103.

Plaintiffs rely on *Bowne,* 150 F.R.D. 465, for the proposition that a showing of tactical use of the disclosed materials is not a prerequisite to a finding of subject matter waiver. In particular, they refer to the passage in which the *Bowne* court says:

It bears emphasis that these cases do not require the discovering party to demonstrate prejudice, such as, for example, proof that the privilege holder has disclosed only favorable materials. They also do not require the discovering party to demonstrate that the privilege holder is putting the privileged communications in issue in the litigation. It appears sufficient, for a waiver as to subjects discussed in the disclosed conversations, that the privilege holder has voluntarily revealed only some of the communications on the subject and has withheld others.

*Id.* at 485. For the reasons discussed below, I find that *Bowne* is both legally and factually distinguishable from the cases at hand.

First, plaintiffs have failed to identify any decisions by a court within the Second Circuit other than *Bowne* suggesting that a finding of subject matter waiver does not require a showing of tactical disclosure or other unfairness. The passage quoted by the plaintiffs follows a survey of cases finding a broad implied waiver as a result of disclosure of privileged communications in the context of litigation. *See id.* Among all of the cases cited for that proposition, the *Bowne* court provides only one case from this Circuit.[11] In fact, the *Bowne* court made note of the "ambiguous state of the law in this Circuit," and based its reasoning on what the New York Court of Appeals was likely to hold with respect to voluntary disclosure in deposition testimony as well as the "general tenor of the federal cases" it cited. *Id.*

Moreover, since *Bowne*, courts in this Circuit have addressed claims of subject matter waiver a number of times and have consistently examined the issue in light of the fairness concerns described above. *See, e.g., United States v. Bilzerian*, 926 F.2d 1285, 1292 (2nd Cir.1991); *EEOC v. Johnson & Higgins, Inc.*, No. 93–CV–5481, 1998 WL 778369 at *8 (S.D.N.Y. Nov. 6, 1998) ("This 'subject matter waiver' doctrine is based on 'fairness considerations,' which 'aim to prevent prejudice to a party·and distortion of the judicial process,'" (quoting *In re von Bulow*, 828 F.2d at 101)); *In re Subpoena Duces Tecum Served on Willkie Farr & Gallagher*, No. M8–85, 1997 WL 118369 at *3–4 (S.D.N.Y. Mar. 14, 1997) ("The waiver of underlying materials or a complete subject matter waiver applies when a party seeks to use the privilege selectively, as both a sword and shield in litigation, ... [and] requires that the remedy be narrowly tailored to address the potential prejudice."); *Carter v. Rosenberg & Estis, P.C.*, No. 95–CV–10439, 1996 WL 695866 at *2 (S.D.N.Y. Dec. 4, 1996) ("'subject matter waiver' is typically used when a party attempts to use the document or communication as both a sword and a shield in the litigation ... [or] ... if there

are other factors weighing in favor of access.").

The facts in *Bowne* are also distinguishable. In *Bowne*, the party asserting privilege had, in previous litigation, "by its counsel, agreed to a limited waiver of all privilege and work product claims in connection with the depositions of its witnesses." *Bowne*, 150 F.R.D. at 477. The court noted that the party asserting the privilege "chose, for its own tactical reasons, to waive the privilege as to any matters relevant to the counterclaims in the [previous litigation]." *Id.* at 479. While the choice of what was revealed may not have been tactical, the court's reasoning clearly depended upon the strategic nature of the decision to reveal privileged communications.

In the present litigation, defendants waived whatever privilege may have attached to the 37,000 documents only after their privilege claims had been rejected by the Minnesota court. Defendants played no part in deciding which 37,000 of the over 230,000 documents in issue would be disclosed and which claims of privilege would be enforced. This is significantly different from the situation in *Bowne*, in which the defendants, for their own purposes, voluntarily agreed to provide deposition testimony revealing communications they claimed were privileged. While the court in *Bowne* may not have required the party challenging the privilege to demonstrate prejudice in the form of proof that the party· asserting privilege had disclosed only favorable materials, its decision nevertheless depended upon a voluntary disclosure of some, but not all, privileged communications, made in the context of discovery.

In this case, it is plaintiffs who seek to make use of the 37,000 documents as well as any other documents or conversations that fall, according to their argument, within a broad "subject matter waiver." Accordingly, and because the defendants are not attempting to use disclosure of the 37,000 documents in a manner that would prejudice the plaintiffs before this court, I find that the broad subject matter waiver sought by plaintiffs is

**11.** *See Bower v. Weisman*, 669 F.Supp. 602, 604   (S.D.N.Y.1987) (applying New York law).

unwarranted. Plaintiffs' motion to compel discovery pursuant to broad subject matter waiver is therefore denied.

### Use of the 37,000 Documents in Discovery

The parties seek a general ruling governing the use of the 37,000 documents during discovery, and particularly during the examination of witnesses at depositions. *See, e.g.,* Letter from Fox to M.J. Gold of 10/22/99, at 9–10, and Letter from Fitzpatrick to M.J. Gold of 11/8/99, at 4–5. Neither side has proposed specific guidelines, although plaintiffs suggest that they may do so after obtaining transcripts of depositions in which there have been disputes over the use of the documents.

In light of this court's ruling that the 37,000 documents are not privileged, but that no implied subject matter waiver has occurred, the following seems clear. Defendants' contention that the communications, information, opinions or other statements reflected in the 37,000 documents are privileged may not be the basis for an instruction not to answer or an assertion of privilege during discovery. However, the substance of any otherwise privileged communications *which are not reflected in the documents* may not be the subject of inquiry simply because those communications involve the same subject matter as the document, or took place while the document was being prepared, reviewed or discussed. In short, the critical factor is whether the substance of the communication is revealed in the document.

Accordingly, and by way of example only, no privilege objection may be interposed when a questioner asks who authored one of the 37,000 documents, when it was authored, from whom the author obtained the data, information or opinions reflected in the document, and how the data, information or opinions were communicated. Similarly, it would be improper to object to questions regarding who else was present when the communication took place, or to whom the document was circulated. Because the complaints in these cases raise allegations of fraud, it is particularly critical for plaintiffs to discover what defendants knew and when they knew it. Thus, and because the information would not be privileged in any event, questions about circulation need not be limited to distribution of the document immediately after is was prepared; a witness may be compelled to provide information indicating whether any other relevant person saw the document at any point in time, and to provide the basis for that knowledge, even if it was obtained during a meeting or conversation that would otherwise be privileged.

On the other hand, defendants may assert a privilege objection when a question requires a witness to reveal the substance of an otherwise privileged communication that is not already reflected in the document at issue. Thus, by way of example, a witness may be asked if he or she ever discussed the contents of a document with another person, who the other person was, whether anyone else was present, and the time and place of the discussion. However, assuming that a privilege otherwise applies to the discussion, the witness may properly be instructed not to reveal its substance to the extent it includes information, opinions, data or communications not reflected in the document itself.

It may be appropriate to revisit these guidelines as the parties attempt to put them into practice. Counsel are of course free to seek appropriate amplification or modification as discovery proceeds.

### Conclusion

For the foregoing reasons, plaintiffs' motion to declare the 37,000 documents not privileged is granted. Plaintiffs' motion seeking discovery premised upon broad subject matter waiver is denied. The 37,000 documents shall be used in discovery, and privilege objections with respect to them shall be made, in a manner consistent with this memorandum and order absent further ruling by the Court.

**SO ORDERED.**

Dec. 28, 1999.